The judgment of the court was pronounced by
Slidell, J.
This suit is brought to contest an election of directors of the New Orleans and Carrollton Railroad Company. The defendants being returned as elected, took their seats, and are in office.
Mrs. Duncan, by her husband acting as her attorney, gave one hundred votes, for the defendants, upon stock standing in her name. Mr. Duncan had already voted one hundred votes on stock standing in his name. By the charter, one hundred votes is the maximum allowed to any person, how great soever may be the number of his shares. His votes as agent of his wife were received under protest by the plaintiffs. He made oath before the commissioners, that the stock in her name was bona fide her property. It appears that Mrs. Duncan became the owner of the stock after her marriage; and the plaintiffs invoke the presumption of law, that properly acquired by the spouses in the name of either of them during the marriage, is community. At the trial of the cause, a marriage contract was offered in evidence by the defendants, which contains a stipulation, that the community of acquets should not exist between the parties. The plaintiffs do not now deny that Mrs. Duncan was the real and separate owner of the stock, and had a right to vote; but they say, that the vote should have been rejected by the commissioners, because they had not before them legal evidence of the fact, and that the legality of the vote given must repose solely upon the evidence offerred before the judges of the election. We are not prepared to say, that for the purposes of an election, the evidence was insufficient. But *543 however that may, be, it is now fully established that the vote was one which Mrs. Duncan was legally entitled to give. It would be against reason to set aside an election effected by legal votes, because full proof of their being legal was not laid before the commissioners; and we are aware of no precedent for such a course. The plaintiffs cite the case of the Mohawk and Hudson Railroad Company, 19 Wendell, 135; but there the question was, whether the election should be set aside because, as was alleged, a vote had been improperly rejected. In determining whether the rejection was legal, the court intimates that it could not look beyond the evidence presented to the commissioners. The want of analogy between the two cases is obvious. If a party neglects to present proper evidence to the commissioners, and his vote is rejected, it is his own laches; and he has no equity in asking a court to relieve him from its consequences. But when the commissioners, on insufficient evidence, have received a legal vote, why overthrow an election, when the same vote would, on proper evidence, be received again.
It appears that on the books of the bank Palmer and Blatchford, trustees, stood as owners of one hundred shares of slock. R. M. Blatchford, trustee, stood on the books as owner of one hundred shares. Palmer and Blatchford, trustees, and R. M. Blatchford, trustee, respectively voted one hundred votes. These were contested, on the ground that the deeds of trust wore not exhibited, and no proof was adduced for whom they were trustees. Their authority to vote is questioned, and it is also urged, that it may be that the stock was held by those parties for persons who have voted to the limit of the charter upon other shares, and that the two trusts may be for one and the same person. The plaintiffs refer to the clause of the charter which prescribes, that no person, corporation, or firm shall be entitled to a greater number than one hundred votes.
It is inferrable, from the evidence in the cause, that Blatchford and Palmer are residents of New York. They acted at the election by an attorney.
In Brown v. Bissell, 6 Cowan, 109, the court considered as indubitable, the right of a person to vote upon stock standing in his name, although held by him in trust for another. The legal estate is in him, said the court, and until divested by assignment, either voluntary or compulsory, he is the only person entitled to vote. We see no reason for adopting a different rule here with regard to foreign stockholders of our corporations holding in the capacity of trustees, and whose capacity as such the corporation has recognized on its stock books.
As to the argument derived from the charter, if it were affirmatively shown, that the trusts were either for the same individual, or for the benefit of other stockholders who had already exercised the privilege of voting up to the limit, then perhaps a case might arise for the rejection of the votes. But the plaintiffs have not proved that such was the case; and we concur with the position assume'd by the defendants, that the bare possibility that the votes are held for the use of such persons, is not to be regarded. The contingency is too remote to deserve notice as a legal presumption. Any one may be an owner of this stock; and the probabilities are, therefore, quite against the hypothesis, that it is held for some of the stockholders who had already voted. The mere assertion, that the votes may possibly be illegal, is not sufficient to put the defendants on proof of their legality. The hypothesis presented by the plaintiffs, assumes a fraud upon the charter; and fraud is not to be presumed.-
It is unnecessary to consider the alleged illegality of the reception of the votes of Mrs. Burlhe, Meux and Holcombe, and the alleged illegality of the *544 rejection of the votes offered by the proxy of another stockholder; because, if the plaintiff’s case was made- out with regal'd to them, the defendants would Still have a sufficient number of legal votes to maintain their election.
L. Millauclon, one of the elected, is said to be ineligible under the clause in the charter which excludes from the direction insolvent persons. The only atlempt to prove that he came within that provision consisted in showing that he was indebted to the company on a stock loan in the sum of about $100,000, including interest. It further appeared, that the interest on this loan had been in arrears for several years, and that in February, 1850, the company .took in payment of the debt, his notes at one, two, three, four, and live years from date, bearing interest at six per cent. It does not appear that the notes representing the original debt had ever been protested. It ■was said, in argument by ihe counsel for the plaintiffs, that the transaction could be accounted for only upon one of two hypotheses: either that Millaitdon was insolvent, or that there had been undue indulgence to him by the directors. However extraordinary the course of the directors, under the evidence presented, may appear, the court cannot consider the facts shown as establishing the insolvency of the party in question.
The defendant Duncan is alleged to be disqualified to sit as a director, because he is an alien. By a statute enacted in 1842, it was declared that “ no person shall hereafter be elected or appointed a director of any bank in this State who shall not, at the time of his election or appointment, be a citizen of the United States, and. of this State.” At the same session of the Legislature a statute was enacted entitled “an act to revive the charters of the several banks located in the city of New Orleans, and for other purposes.” This statute is mainly composed of regulations intended to control the future issues and operations of the banks, whose previous wild and disastrous career is a matter of history. But it also contained provisions authorizing such banks as desired to do so, to abandon their.banking privileges and business, and retain their corporate powers and privileges so far only as their continuance might be necessary to retain the property in any public works and improvements, and to manage and carry on the same until the termination of their charters. The New Orleans and-Carroilton Railroad Company fell within the class contemplated by the statute. It was both a bauk and a railroad company. It abandoned its banking privileges; discontinued doing business as a bank; proceeded to the liquidation of its banking affairs; and has long since ceased to be a bank. It has been for several years a railroad company. The legislative interference with banking corporations, with which the statute books of 1842, 1843., &c. abound, grew out of the gross abuses and the disastrous results of the banking business. The exclusion of foreigners was, perhaps, considered one of the means to prevent future abuses; or more probably it was dictated by an apprehension that foreign capitalists, by getting control of boards of direction, might control through them the monetary affairs of the State. There is nothing in the legislation in question, upon a reasonable view of its subject matter and of its general scope and intendment, to authorize the belief that the lawgiver intended to discourage aliens from being interested in what are denominated in the statute works of public improvement, by excluding them from a participation in their mangement. The directors of this company 'are not directors of a bank, and the statutory prohibition is therefore inapplicable to their case.
It is therefore decreed, that the judgment of the district court be reversed, and that the petition be dismissed ; the plaintiffs paying costs in both courts.